Maxine WILSON, Terry Wilson, Alfredo Smith, Sharon Smith, and Juan Quintanilla, Individually and as Class Representatives, Plaintiffs,

v.

Isaac TOUSSIE, Robert Toussie, Toussie Family Homes, David Park Estates, Inc., Easy Home Program Corporation, Fobert Corp., Marconi Realty Ltd., Rod Staten Corporation, Smith-Haven Mortgage Corporation, Fleet Mortgage Corporation, Washington Mutual Home Loans, Mutual of North America, Star Bank, N.A., Firstar Corporation, PMCC Mortgage Corporation, Mortgage Catalog Store, Inc., HSBC Bank USA, First West Mortgage Bankers, Ltd., Community Home Mortgage Corporation, Flagstar Bancorp, Inc., Chase Manhattan Mortgage Corporation, Defendants.

No. CV01–4568 DRHWDW.

United States District Court, E.D. New York.

April 25, 2003.

Milberg Weiss Bershad Hynes & Lerach LLP by Barry A Weprin, Esq., Paul D. Young, Esq., Kirk E. Chapman, Esq., New York City, for Plaintiffs.

Leeds Morelli & Brown, P.C., Carle Place by Lenard Leeds, Esq., Jeffrey Brown, Esq., Carle Place, NY, for Plaintiffs.

Scheyer & Jellenik by Richard I. Scheyer, Esq., Nesconset, NY, for Toussie Defendants.

Rosenberg Calica & Birney LLP by Robert M. Calica, Esq., Garden City, NY, for Defendant PMCC Mortgage Corp.

Barbara M. Pizzolato, P.C. by Barbara M. Pizzolato, Esq., Hauppauge, NY, for Defendant Mutual of North America.

Silverman Perlstein & Acampora LLP by Anthony C. Acampora, Esq., Jericho, NY, for Defendant First West Mortgage Bankers Ltd.

Arent Fox Kitner Plotkin & Kahn, PLLC by Alison J. Besunder, Esq., Hunter T. Carter, Esq., Gary C. Tepper, Esq., New York City, for Defendant Chase Manhattan Mortgage Corporation.

Stroock & Stroock & Lavan LLP by Kenneth Pasquale, Esq., Michele L. Pahmer, Esq., Jacob Miota, Esq., New York City, for Defendant Fleet Mortgage Corporation and its successor in interest Washington Mutual Bank, F.A.

### ORDER

HURLEY, District Judge.

Plaintiffs have made a renewed motion to amend the complaint. For the reasons discussed *infra,* the Court denies the motion as futile. As more fully discussed herein, the Court concludes that claims against certain of the defendants cannot be rehabilitated. However, revised pleading may cure some of the defects identified as to other defendants. As a result, leave to

renew this motion shall be subject to the restrictions of this Order. In the Discussion portion of this Order, the Court addresses each of the parties' proffered arguments. The purpose of this discussion is to provide guidance to the parties as to what issues should be addressed in any renewed motion to amend the Complaint.

## I. BACKGROUND

### A. Procedural Background.

Plaintiffs commenced this action on July 10, 2001, by filing the original complaint. The original, twelve-count, putative class action complaint alleged violations of 42 U.S.C. §§ 1981, 1982, 1985(3), 1986, 3604(a), 3604(b), 3604(d) and 3605, as well as state law violations of § 296 of the New York Executive Law, § 349 of the New York General Business Law, Title 8 of the Administrative Code of the City of New York, and common law breaches of contract, express warranty, and implied warranty of habitability and workmanlike construction. On November 20, 2001, Defendant First West Mortgage Bankers Ltd. served its answer upon Plaintiffs.

On January 10, 2002, Plaintiffs submitted a proposed first amended complaint ("First Amended Complaint"). Plaintiffs originally contended that this First Amended Complaint effected an amendment as of right, *see* Fed.R.Civ.P. 15(a).

However, since an answer had been served and filed, Plaintiffs, at the Court's direction, resubmitted this First Amended Complaint as part of a motion for leave to amend the complaint. *See id.*

Plaintiffs' First Amended Complaint spanned 573 pages and contained 4555 numbered paragraphs. The First Amended Complaint contemplated the joinder of approximately 400 individual named plaintiffs and the addition of 55 new defendants. (Four of the defendants named in the original complaint were also to be dropped from the suit.) The 72 total Defendants in the First Amended Complaint were classified as (1) Seller Defendants, (2) Lender Defendants, (3) Builder Defendants, (4) Appraiser Defendants, (5) Abstract Company Defendants, (6) Lawyer Defendants and (7) Current Lender Defendants. The Lenders were Mortgage banks that made residential real estate loans to the purchasers of homes sold by the Seller Defendants.[1] As defined by that First Amended Complaint, the Current Lenders are Corporations providing residential loans in the New York metropolitan area who acquired and hold loans made by the Lender Defendants to purchasers of homes sold by the Seller Defendants.[2] The Current Lenders were solely named as defendants in one cause of action, alleging that they had been unjustly enriched.

---

**1.** The Lenders named in the First Amended Complaint included American Brokers Conduit, Chase Manhattan Mortgage Corp., Cliffco Mortgage, Countrywide Lending, Equity Management, Executive Mortgage Bankers, Ltd., Firstar Corporation, Fleet Mortgage Corporation, Mortgage Catalog Store, Inc., Mutual of North America, PMCC Mortgage Corporation, Smith–Haven Mortgage Corp. and Washington Mutual Home Loans.

**2.** The Current Lenders, as alleged in the First Amended Complaint, included ABN AMRO Bank, American Brokers Conduit, Aurora Loan Services, Bank of America, Bank One Corporation, Chase Manhattan Mortgage Corp., Citimortgage, Conseco Finance Credit Corp., Countrywide Lending, EMC Mortgage, Firstar Corporation, Fleet Mortgage Corporation, Full Spectrum Lending, GMAC Bank, Homeside Lending, HSBC Bank USA, Impac Funding, Indy Mac Bank, James B. Nutter, J.I. Kislak Mortgage Corporation, Liberty Mutual Group, Midland Mortgage Company, Mortgage Lending of America, North Fork Bank, Norwest Mortgage, Option One Mortgage Corp., PHH Mortgage, Pitt Greenville Mortgage Lenders Association, Inc., Regents Bank, Regions Mortgage, Roslyn National Mortgage Corp., St. Claire Mortgage Corporation, Waterfield Mortgage Company and Wells Fargo Bank.

On September 6, 2002, the Court issued a written order denying leave to amend the complaint. In that Order, the Court noted various joinder problems endemic to the First Amended Complaint. Plaintiffs filed a timely motion for reconsideration and reargument. On January 6, 2003, the Court heard oral argument from counsel regarding Plaintiffs' motion for reconsideration and reargument. At the conclusion of the oral argument, the Court granted reconsideration but ultimately decided to abide by the conclusions of the September 6, 2002, Order.

At that January 6, 2002, oral argument, Plaintiffs expressed a desire to submit a proposed Second Amended Complaint. The Court granted leave to submit that Second Amended Complaint in the form of a renewed motion for leave to amend the complaint.

### B. Allegations of the Second Amended Complaint.

The Second Amended Complaint names thirty-two Plaintiffs. These Plaintiffs are named individually as well as in their capacity as representatives of a putative class. All of the Plaintiffs are identified as either "black" or "hispanic" and reside in the New York area.

The Second Amended Complaint also names Isaac Toussie, Robert Toussie and their various real estate businesses,[3] referred to as the Seller Defendants ("Sellers"); PMCC Mortgage Corp. ("PMCC") and Smith–Haven Mortgage Corp. ("Smith–Haven"), referred to as the Lender Defendants ("Lenders"); and thirty-four current holders of mortgage notes,[4] referred to as the Current Lender Defendants ("Current Lenders"). With regard to the Sellers, Plaintiffs allege the following:

> In residential subdivisions that they create and build, the Sellers have implemented a policy by which they covertly steer minority buyers to purchase defective homes in predominantly minority neighborhoods and away from predominantly white neighborhoods. Furthermore, Sellers lure these inexperienced and low income inner city minority buyers into purchasing homes that they cannot afford and that: (i) are intentionally overpriced and over-appraised ...; (ii) have mortgage and/or property tax payments that are dramatically higher than represented and expected ...; (iii) are defectively built; (iv) lack the amenities promised by Sellers; and (v) are located in different towns and in worse neighborhoods than represented by Sellers.

Second Amended Complaint ¶ 78. The Second Amended Complaint also alleges that the Sellers prepared false loan applications and other documents for submission to the United States Department of

**3.** These businesses include Toussie Family Homes, David Park Estates, Inc., Easy Home Program Corp., East Coast Land Developers Corp., Flend Corp., Fobert Corp., Housing Corp. of America, Marconi Realty Ltd., Rod Staten Corp., Toussie Family Enterprises Ltd., Toussie Group Ltd., Your Long Island Home Corp. and Your Staten Island Home Corp.

**4.** The thirty-four current lenders in the Second Amended Complaint include: ABN AMRO Bank, American Brokers Conduit, Ameriquest Mortgage Co., Aurora Loan Services, Bank of America, Bank One Corporation, Beneficial Mortgage Corp., Centex Home Equity Company LLC, Chase Manhattan Mortgage Corp., Citimortgage, Conseco Finance Credit Corp., Countrywide Lending, EMC Mortgage, Firstar Corp., Fleet Mortgage Corp., Full Spectrum Lending, GMAC Bank, Homeside Lending, HSBC Bank USA, Impac Funding, Indy Mac Bank, James B. Nutter, J.I. Kislak Mortgage Corp., Lighthouse Mortgage Corp., Midland Mortgage Co., National City Mortgage Co., North Fork Bank, Norwest Mortgage, PHH Mortgage, Regions Mortgage, RFC SFJV–2002 LLC, Roslyn National Mortgage Corp., St. Claire Mortgage Corp., Waterfield Mortgage Company and Wells Fargo Bank.

Housing and Urban Development ("HUD"). Id. ¶¶ 99, 100. Plaintiffs intermittently refer to the overall scheme described above as a "conspiracy." *See, e.g., id.* ¶ 107.

The Second Amended Complaint also alleges that: "The Seller[s] ... arrange class members' mortgages with the Lender[s] .... The Sellers refer class members to Lender[s] ..., which are cooperating financial agencies and that the Sellers are affiliated with by common control, contract or business relationship." *Id.* ¶ 108. With regard to the Lenders, Plaintiffs allege that they "knowingly participate[d] in this criminal conspiracy in order to, among other things, generate income through points and fees." *Id.* Plaintiffs also allege that the Lenders "submit[ted] class members' loan applications to HUD," "[d]espite knowing of the false contents of the applications." *Id.*

With respect to certain of the Current Lenders, the Second Amended Complaint alleges:

> The Lender[s] ... serve[d] as agents and mortgage brokers on behalf of other, principal banks which hold the mortgage[s] after closing, including Current Lenders Fleet [Mortgage Corp.], Chase [Manhattan Mortgage Corp.], Citimortgage, Firstar [Corp.], Countrywide [Lending], Norwest [Mortgage], PHH Mortgage, ABN AMRO [Bank], Waterfield Mortgage Company and American Brokers Conduit. Prior to closing, the Lender[s] ... have already arranged to sell the note and mortgage to these Current Lenders. In fact, [P]laintiffs [we]re told at closing to make their first monthly [mortgage] payments to these Current Lenders.

*Id.* ¶ 109.

With regard to all Current Lenders, the Second Amended Complaint alleges that "[t]he Current Lender[s] ... each acquired and hold one or more of the class members' loans, having acquired the loan either at closing or in the secondary market." *Id.* ¶ 130.

> The notes held by the Current Lender[s] ... are grossly over-inflated due to the practices described above. Consequently, the debt owed by class members to Current Lender[s] ... is much greater than if class members' homes had been accurately appraised, providing the Current Lenders with an unfair benefit .... In addition, ... class members are also forced to pay interest at a higher rate than if the homes had been accurately appraised .... [and a]s the current holders of the notes, the Current Lender[s] ... benefit[ed] from these excess interest payments.

*Id.* ¶ 131–132. The Second Amended Complaint also alleges that the Current Lenders refused to voluntarily restructure or refinance Plaintiffs' loans. *See id.* ¶ 134–138.

As more fully set out in the Second Amended Complaint, Plaintiffs allege the following causes of action against only the Sellers: (1) Claim I—violation of the Federal Fair Housing Act, 42 U.S.C. § 3601, et seq.; (2) Claim II—violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981; (3) Claim III—violation of 42 U.S.C. § 1982; (4) Claim VIII—violation of the New York Human Rights Law, N.Y. Exec. Law § 296; (5) Claim IX—violation of New York General Business Law § 349; (6) Claim X—violation of Title 8 of the Administrative Code of the City of New York; (7) Claim XI—breach of contract; (8) Claim XII—breach of express warranty and (9) Claim XIII—breach of implied warranty of habitability. Against both the Sellers and the Lenders, Plaintiffs allege: (1) Claim IV—violation of 42 U.S.C. § 1985(3) and 42 U.S.C. § 1986; (2) Claim V—violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691; (3)

Claim VI—violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (4) Claim VII—RICO conspiracy, under 18 U.S.C. § 1962(d). With regard to the Current Lenders, Plaintiffs only allege, in Claim XIV, unjust enrichment.

Based upon those causes of action, Plaintiffs pray for declaratory judgment, a permanent injunction barring any continuation of the allegedly discriminatory conduct, compensatory damages, punitive damages, treble damages, costs, a temporary injunction barring the Current Lenders from foreclosing on properties purchased by class members, declaratory judgment that class members' mortgages are null and void and, finally, that the Court "enter a permanent injunction providing for equitable reformation of the class members' mortgages, and directing that the Current Lender[s] ... take all affirmative steps necessary to refinance [P]laintiffs' mortgages based on their income and the accurate market value of their homes," *id.* at p. 44.

## II. DISCUSSION.

### A. Fed.R.Civ.P. 15(a).

Rule 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, " '[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend.' " *Lucente v. International Business Machines Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (quoting *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (per curiam)). "One appropriate basis for" evaluating the "productivity" of a proposed amendment lies in the relative futility of accepting the proposed amended complaint. *Id.* One proper standard for the evaluating futility is whether the complaint can satisfy the pleading requirements of Fed.R.Civ.P.

9(b), if applicable. *See In re Boesky Securities Litigation,* 882 F.Supp. 1371, 1384 (S.D.N.Y.1995). The Court may also evaluate futility by determining whether the proposed amended complaint "would withstand a motion to dismiss pursuant to [Fed.R.Civ.P.] 12(b)(6)." *Dougherty v. North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002). Under the Rule 12(b)(6) standard of futility, as applied by the Second Circuit, the Court should grant leave to amend the complaint " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court applies both futility standards herein.

### B. The Sellers.

The parties do not provide briefing on whether the claims against the Sellers are futile in any manner. Therefore, the Court does not reach the issue of whether the claims asserted against the Sellers would withstand a Rule 12(b)(6) motion or contain sufficient particularity under Rule 9(b).

### C. The Lenders.

#### 1. Class Certification.

Defendant PMCC Mortgage Company, one of the two Lenders, submitted a brief in opposition to Plaintiffs' motion for leave to amend. In that memorandum, PMCC Mortgage Company first argues that the Second Amended Complaint fails to allege sufficient facts for class certification under Fed. Civ. R. 23. This argument is improper in the context of the Court's current Rule 15(a) inquiry. *See In re Blech Sec. Litig.,* 928 F.Supp. 1279, 1296 (S.D.N.Y. 1996) (holding that any questions regard-

ing the sufficiency of class allegations are "more appropriately considered in the context of a motion for class certification . . . ."). As such, the Court does not reach the merits of the argument.

### 2. Fed R. Civ. P. 9(b) Particularity and Specificity.

PMCC Mortgage Company's brief next advances the argument that amendment would be futile as to the Lenders because Plaintiffs' have failed to plead RICO violations based upon mail fraud—Claim VI—with sufficient particularity. The requirements of Fed.R.Civ.P. 9(b) apply to RICO claims asserting mail fraud.[5] *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir.1999). Moreover, failure to comply with the requirements of Rule 9(b) can support a showing of futility. *See In re Boesky*, 882 F.Supp. at 1384.

In the context of a RICO claim, the Second Circuit has held that "Rule 9(b) calls for the complaint to 'specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" *Moore*, 189 F.3d at 172 (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992)). The complaint must also "identify the purpose of the mailing within the defendant's fraudulent scheme," *McLaughlin*, 962 F.2d at 191, and "allege facts that give rise to a strong inference of fraudulent intent," *San*

*Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir.1996).

PMCC contends that the Second Amended Complaint, as drafted, fails to provide sufficient particularity as to its fraudulent conduct. PMCC contrasts this required specific, individual conduct with the general conduct that is broadly attributed to all Lenders by the Second Amended Complaint. "[W]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Di Vittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). With regard to PMCC, the Second Amended Complaint fails to satisfy Rule 9(b)'s specificity requirements.

Paragraphs 106 and 107 allege participation by "the Lender Defendants" in the asserted scheme. Specifically, Paragraph 106 alleges that "[t]he Lenders actively participate[d] in th[e] practice of issuing fraudulent letters," while Paragraph 107 alleges "[t]he Lenders knowingly participate[d] in this criminal conspiracy in order to, among other things, generate income through points and fees." However, these paragraphs fail to allege specific conduct on the part of PMCC. Paragraph 109 similarly alleges that the Lenders "serve[d] as agents and mortgage brokers on behalf of other, principal banks . . . ," but alleges no individual actionable conduct.[6] Paragraph

---

5. RICO Conspiracy Claims, however, are not evaluated under Rule 9(b). *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n. 4 (2d Cir.1990) ("pleading of a [RICO] conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a)."). Therefore, to the extent that PMCC argues that Rule 9(b) applies to the RICO conspiracy claim in the Second Amended Complaint, that argument is in error.

6. Paragraph 109 does allege that "Mann, a former loan officer of defendant PMCC, state[d] that during his employment, PMCC followed the underwriting requirements set forth by the[ ] Current Lenders, had open lines of credit from these Current Lenders and were not required to submit the loan applications for pre-approval to these current lenders." However, none of these specific facts relate to the actual frauds alleged in the RICO Claim.

110 similarly fails to allege specific facts with regard to PMCC. Moreover, according to the allegations of the Second Amended Complaint, when fraud did occur, it did not always occur in the same form. *See id.* ¶ 94 ("Although a majority of plaintiffs are [Fair Housing Administration ("FHA")] loan recipients, the fraudulent scheme also snares some low income buyers who did not receive FHA loans.").

Paragraphs 111 and 112 of the Second Amended Complaint refer to statements made by a former officer of PMCC. Despite the fact that these statements contained richer details and descriptions than those found in the balance of the Second Amended Complaint, paragraphs 111 and 112 still fail to identify which applications were fraudulent and how they were fraudulent. To the contrary, the facts alleged in these paragraphs indicate that fraud occurred in only a certain amount of the loan applications. *See* Second Amended Complaint ¶ 111 (stating that 50% of the "second jobs" listed on loan applications "were outright fabrications"). As a result, rather than providing greater specificity regarding the RICO claims, Paragraphs 111 and 112 only serve to further muddy the waters.

"Rule 9(b) is not satisfied by a complaint in which 'defendants are clumped together in vague allegations.'" *Dietrich v. Bauer*, 76 F.Supp.2d 312, 330 (S.D.N.Y.1999) (quoting *In re Blech*, 928 F.Supp. at 1294). Moreover, in civil RICO actions, "the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency . . . ." *Plount v. American Home Assur. Co.*, 668 F.Supp. 204, 206 (S.D.N.Y. 1987). In light of the forgoing, under Rule 9(b), Plaintiffs are required to indicate which loans contained fraudulent statements, the extent which each of the individual Lenders participated, and the character of the Lenders' involvement in each fraud. The general allegations of the RICO claim, as framed by the Second Amended Complaint, fails to meet the requirements of Rule 9(b).

The actual elements of the RICO violation are alleged in Claim VI. Despite this cursory mention, these elements also suffer from a lack of particularity. As stated before, Plaintiffs, pursuant to the requirements of Rule 9(b), must "[1] specify the statements it claims were false or misleading, [2] give particulars as to the respect in which plaintiffs contend the statements were fraudulent, [3] state when and where the statements were made, and [4] identify those responsible for the statements." *Moore*, 189 F.3d at 172 (quotation omitted). The Second Amended Complaint contains general allusions to each of these elements but, as alleged, Plaintiffs have failed to provide the appropriate specificity. Such general allusions regarding the elements also fail to satisfy the Rule 9(b) standard. *See Bologna v. Allstate Ins. Co.*, 138 F.Supp.2d 310, 321–322 (E.D.N.Y. 2001).

The Court does not see any reason, however, why Plaintiffs would be unable to plead these additional facts. To the contrary, the voluminous First Amended Complaint and Exhibit 1 to the Second Amended Complaint indicate that Plaintiffs actually can allege facts with greater particularity than those contained in the Second Amended Complaint. Therefore a Third Amended Complaint, curing the deficiencies noted in this Order, could conceivably pass muster under the Rule 9(b) standard. Moreover, the Court is aware that "[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990). However, based upon the proffered materials, the Court

cannot, at this time, ascertain whether this exception applies to any portions of the RICO claims against the Lenders.

3. Over–Broad and Inconsistent.

PMCC also contends that Plaintiffs' RICO claims are over-broad and inconsistent. *See* PMCC Memorandum at 10. The substance of PMCC's argument on this point is unclear. In relevant part, PMCC argues:

> The factual allegations of the complaint charge that the named Lender Defendants were just two of the many lenders to which Seller Defendants referred prospective purchasers (*see* ¶ 97) [sic] the only allegations in the entire complaint concerning the number of times that the two named Lender Defendants were involved, is that they were "repeatedly" used by the Sellers, meaning more than once .... The claim[, contained in ¶ 173,] that "the Lender Defendants" were involved in every loan and therefore every part of the racketeering conspiracy, is not supported by the factual allegations of the complaint, is in fact directly contradicted by the factual allegations (¶ 97), and is therefore over broad and fails to state a claim upon which relief may be granted against the Lender Defendants.

*Id.*

■ It is true that "[a] RICO claim, replete with the ruinous threat of treble damages, can not be assembled by cobbling together plainly inconsistent allegations of fraud." *McLaughlin*, 962 F.2d at 191. Nevertheless, to the extent that PMCC argues that the allegations in the Second Amended Complaint are so internally inconsistent that the RICO claims are legally insufficient or frivolous on their face, the Court does not agree. The mere fact that Plaintiffs, in the context of a putative class action complaint, refer to defendants collectively in one portion of the complaint and then refer to them specifically in other areas of the complaint does not create any inconsistency or overbreadth that would render the proposed amendment futile.

4. Pleading the Elements of the RICO Claims.

PMCC further argues that Plaintiffs failed "to allege [ (1) ] a racketeering 'enterprise' involving PMCC, [ (2) ] intent to join the defined enterprise or to join the conspiracy .... [and (3) ] racketeering 'injury.'" PMCC Memorandum at 14, 15. The Court first considers the "enterprise" argument.

The statute defines an "enterprise" as including a "group of individuals associated in fact." 18 U.S.C. § 1961(4). In *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court ruled that the enterprise requirement is satisfied by alleging a "group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* "The enterprise need not necessarily have a continuity extending beyond the performance of the pattern of racketeering acts alleged, or a structural hierarchy, so long as it is in fact an enterprise as defined in the statute" and the Second Circuit has "repeatedly found a sufficient enterprise where the complaint alleges a group without centralized hierarchy formed for the sole purpose of carrying out a pattern of racketeering acts." *Pavlov v. Bank of New York Co., Inc.*, 25 Fed.Appx. 70, 71–72 (2nd Cir.2002). Paragraph 171 of the Second Amended Complaint alleges "an association-in-fact 'enterprise' within the meaning of 18 U.S.C. § 1961(4)." Second Amended Complaint ¶ 171. The Second Amended Complaint further bolsters this statement by the factual allegations contained in paragraphs 178 and 179. Despite PMCC's arguments

to the contrary, these allegations are sufficient in the context of the instant motion.

PMCC also argues that, based upon the alleged enterprise, "it is *clear* that PMCC was an 'outsider' not involved in the 'operation and management' of the enterprise." PMCC's Memorandum at 14 (emphasis added). PMCC also argues that the Second Amended Complaint "fails to *establish* that PMCC performed any cognizable racketeering 'conduct' and 'participa[tion]' in the form of 'directing its affairs.' " *Id.* at 15 (quoting *United States v. Viola,* 35 F.3d 37, 41 (2d Cir.1994)) (alteration in original) (emphasis added). These arguments, as presented, concern issues of fact. Such arguments are inappropriate in the context of the instant Rule 15(a) motion. As such, the Court does not reach the merits of those arguments.

Finally, PMCC argues that Plaintiffs have failed to allege a racketeering "injury." This representation is patently incorrect. *See* Second Amended Complaint ¶ 180 ("Plaintiffs have been injured in their property as a result of the pattern of racketeering activity described herein . . . .").

    5.  Other Alleged Pleading Insufficiencies.

PMCC argues that none of the Claims can succeed because the named Plaintiffs actually participated in the alleged frauds. Defendant Fleet Mortgage Corporation and its successor in interest Washington Mutual Bank, F.A. present a similar argument. *See* Fleet Mortgage Corporation Memorandum at 7. The Court understands this argument to suggest that either Plaintiffs' "unclean hands," *see Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), or *in pari delicto* status, *see Perma Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 140, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), could provide an absolute defense to a civil RICO claim. While intriguing, in the context of the instant motion, the argument proves ultimately unavailing.

As an initial matter, it is unclear whether either doctrine may properly be applied to civil RICO claims. To the court's knowledge, the Second Circuit has not ruled on this discrete issue, although other Circuits have provided limited discussion. The First Circuit, in *Roma Const. Co. v. aRusso,* 96 F.3d 566 (1st Cir.1996), opined that the doctrine does not apply but ultimately concluded that the plaintiffs did not have "unclean hands." 96 F.3d at 571–573. The Eleventh and Seventh Circuits have opined that such a doctrine may apply in civil RICO actions. *Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1366 n. 41 (11th Cir.2002) (discussing the "curious nature" of a gambler bringing a RICO claim against a bookie but merely "positing the possibility that the plaintiffs may be barred from bringing such a claim by the 'unclean hands' doctrine."); *Laborers' Intern. Union of North America v. Caruso,* 197 F.3d 1195, 1197–1198 (7th Cir.1999) (evaluating "unclean hands" argument in the context of summary judgment). The Third Circuit has applied the doctrine in the context of whether an injunction, after trial, can be denied. *Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1354–1355 (3d Cir.1989). These cases do little to guide the Court's inquiry into whether the doctrines of "unclean hands" or *in pari delicto* may apply in the instant context.

■  Ultimately, however, PMCC's argument does not persuade the Court to blaze a new jurisprudential path at this juncture. As stated earlier, in the context of the instant Rule 15(a) motion, the Court evaluates the claims of the Second Amended Complaint for futility. Futility may be evaluated under the Rule 12(b)(6) standard. Under the 12(b)(6) standard, the

Court must accept the allegations of the Second Amended Complaint as true, drawing all inferences in Plaintiffs' favor. On the face of the Second Amended Complaint, there is some indication that certain clients were aware of the underlying fraud. *See, e.g.,* Second Amended Complaint ¶¶ 99, 103, 104, 105. However, there are also allegations that indicate that Plaintiffs were not aware of the various fraudulent documents produced in connection with the alleged conspiracy. *See, e.g., id.* ¶¶ 101, 102. Therefore, applying that 12(b)(6) standard to the instant case, the Court cannot conclude, at this point in the litigation, that the actions of any portion of the named Plaintiffs or asserted class warrant application of either the "unclean hands" doctrine or *in pari delicto.*

PMCC next argues that Plaintiffs have failed to state a claim because "[t]he general rule in New York is that statements as to [the] value of real estate are not actionable as fraud." PMCC Memorandum at 17. PMCC cites several cases for this proposition. *See, e.g., Simms v. Biondo,* 816 F.Supp. 814, 819–820 (E.D.N.Y. 1993). The Court has read these cases and finds them unpersuasive. The general rule, as PMCC admits, is subject to certain exceptions. PMCC Memorandum at 17. One of these exceptions is whether the misstatement of value was made in conjunction with a larger scheme or conspiracy to defraud. *See Simms,* 816 F.Supp. at 820 ("Buyers have produced no evidence showing any scheme of deception by the Sellers . . . designed to trick the Buyers about the value of [the property].""). These exceptions are established based upon the particular facts of the case. *See id.* As stated earlier, the circumstances of the individual allegedly fraudulent acts are unclear from the face of the Second Amended Complaint. Therefore, assuming that PMCC's argument is legally correct, the Court, applying the Rule 12(b)(6) standard, cannot evaluate the applicability

of either the general rule or the noted exceptions at this stage of the proceedings.

PMCC's final argument concerns whether Plaintiffs can state a claim under the ECOA where loans were alleged to be *granted* on the basis of race rather than *denied. See* PMCC Memorandum at 19. Under the ECOA, "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—. . . on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)." 18 U.S.C. § 1691(a). This language supports the interpretation that the grant of loans in a predatory manner is actionable under the ECOA.

However, PMCC points the Court to the following language:

> For purposes of this subsection, the term "adverse action" means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

15 U.S.C. § 1691(d)(6).

█ Viewed in isolation, this language suggests that only certain narrow transactions may be considered under the ECOA. However, The Court interprets this language in light of the entire statute. *Yerdon v. Henry,* 91 F.3d 370, 376 (2d Cir. 1996) ("the interpretation of a statute requires consideration of the language of the relevant provision in conjunction with the entire statute"). The subsection referred to in the above quoted language deals with the circumstances in which a credit "appli-

cant against whom adverse action is taken *shall be entitled to a statement of reasons for such action from the creditor."* 15 U.S.C. § 1691(d)(2) (emphasis added). Therefore, the language contained in Section 1691(d)(6) does not alter the expansive language contained in § 1691(a). "By the plain language of the provision, [ECOA] protection is not limited to those applicants who were rejected." *Hargraves v. Capital City Mortg. Corp.*, 140 F.Supp.2d 7, 22 (D.D.C.2000). As such, this specific portion of the Second Amended Complaint would withstand a Rule 12(b)(6) motion.

### D. Current Lenders.

Plaintiffs allege that the Current Lenders were unjustly enriched by purchasing Plaintiffs' mortgage notes on the secondary market. By way of background, in the Court's September 6, 2002, Order, leave to amend was denied on the basis that these Current Lenders were improperly joined under Fed R. Civ. P. 20. At the reconsideration hearing held on January 6, 2003, the Court expressed doubt that Plaintiffs could state a valid claim against the Current Lenders and directed Plaintiffs, in connection with any renewed motion to amend the complaint, to provide briefing on this issue. After reading the briefing provided by the parties on the issue, the Court concludes that Plaintiffs cannot articulate a claim for unjust enrichment that could withstand a Rule 12(b)(6) motion to dismiss.

### 1. Unjust Enrichment and the Holders in Due Course Doctrine.

Unjust enrichment derives from the equitable principle "that a person shall not be allowed to enrich himself unjustly at the expense of another . . . ." *Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337 (1916). The courts apply this principle to create "an obligation . . ., in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience [s]he ought not to retain it." *Id.* "A conclusion that one has been unjustly enriched is essentially a legal inference drawn from the circumstances surrounding [1] the transfer of property and [2] the relationship of the parties." *Sharp v. Kosmalski*, 40 N.Y.2d 119, 123, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976). The Court may reach this legal conclusion "through the application of principles of equity." *Id.* However, the Court does not reach this equitable analysis.

If the Current Lenders are properly considered holders in due course of the mortgage notes, no equitable claim may be asserted against them. *See Marine Midland Bank–New York v. Graybar Elec. Co., Inc.*, 41 N.Y.2d 703, 710, 395 N.Y.S.2d 403, 363 N.E.2d 1139 (1977); *see also* New York Uniform Commercial Code ("N.Y.U.C.C.") § 3–306(a) (McKinney 2001) (holder in due course is free of all claims).

> The holder in due course doctrine . . . has as its objective encouraging and facilitating the ready transaction of negotiable instruments, central to our credit economy; people can rely on the fact that negotiable instruments in the hands of good-faith purchasers will be paid according to their tenor and intent and not paid otherwise. Holder in due course status advances that objective by providing that persons in that category take free of virtually all claims and defenses.

*Hartford Acc. & Indem. Co. v. American Exp. Co.*, 74 N.Y.2d 153, 158–159, 544 N.Y.S.2d 573, 542 N.E.2d 1090 (1989) (citation omitted).

A holder in due course is defined as a(1) holder (2) of a negotiable instrument (3) who took it for value, (4) in good faith, and (5) without notice that it is overdue or has

been dishonored or of any defense against or claim to it on the part of another. N.Y. U.C.C. 3–302[1] (McKinney 2001). "Satisfaction of these requirements is all that is necessary for a payee to obtain the special protections of a holder in due course." *Hartford Acc. & Indem.*, 74 N.Y.2d at 159, 544 N.Y.S.2d 573, 542 N.E.2d 1090.

The UCC defines a "holder" as "a person who is in possession of ... an instrument ..., issued or indorsed to him or to his order or to bearer or in blank." N.Y. UCC § 1–201(20) (McKinney 2001). There is no dispute that the Current Lenders are holders of Plaintiffs' mortgage notes. Conversely, substantial dispute exists as to whether these mortgage notes constitute negotiable instruments.

A negotiable instrument "must ... be signed by the maker or drawer; ... contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article; ... be payable on demand or at a definite time; and ... be payable to order or to bearer." *Id.* § 3–104(1). "A writing which complies with the requirements of this section is .... a "note" if it is a promise other than a certificate of deposit." *Id.* § 3–104(2)(d).

■ Plaintiffs refer the Court to series of cases for the proposition that, under New York law, "a note given in connection with a mortgage generally is not a negotiable instrument." *P & K Marble, Inc. v. LaPaglia*, 147 A.D.2d 804, 537 N.Y.S.2d 682, 683 (3d Dep't 1989); *United States v. Bowman Poultry Farms, Inc.*, No. 92–CV–80S, 1994 WL 577524, at *7 n. 1 (W.D.N.Y. Sept. 30, 1992); *see also Felin Assoc. Inc. v. Rogers*, 38 A.D.2d 6, 326 N.Y.S.2d 413, 415 (1st Dep't 1971). Despite the strong language of these cases, there are certainly cases that have found a mortgage note to be negotiable. *See, e.g., Slutsky v. Blooming Grove Inn, Inc.*, 147

A.D.2d 208, 542 N.Y.S.2d 721, 723 (2d Dep't 1989) ("The note secured by the mortgage is a negotiable instrument ...."); *In re AppOline.com, Inc.*, 285 B.R. 805, 817–818 (Bkrtcy.E.D.N.Y.2002). In fact, as stated in *AppOline.com*, the core inquiry comprises an examination of whether a note contains an unconditional promise to pay a sum certain or an impermissible promise. 285 B.R. at 818; *see also P & K Marble*, 537 N.Y.S.2d at 683. Application of this *AppOline.com* analysis differentiates Plaintiffs' cited cases from the circumstances at hand. In fact, examination of the relevant mortgage notes renders Plaintiffs' cases wholly unpersuasive.

By way of example, the *P & K Marble* court, applying the required analysis, held that the note at question in that case, where the note and mortgage were a single document, "contain[ed] numerous promises, such as to keep the mortgaged property insured, which are not authorized by UCC article 3." 537 N.Y.S.2d at 683. In the instant case, all of the mortgage notes, as alleged, are separate and distinct from the actual mortgages. Moreover, Current Lender Chase Manhattan Mortgage Corp. has submitted, under seal, the mortgage notes of six named Plaintiffs from the Second Amended Complaint (there are thirty-two total Plaintiffs), including Maxine and Terry Wilson. *See* Chase Manhattan Mortgage Corp. Exhibit D. (The Court may consider this submission in connection with a Rule 12(b)(6) inquiry because the Second Amended Complaint references and relies upon the notes. *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991).)

The Court has closely examined this submission. The mere fact that these mortgage notes refer to the corresponding mortgages does not invalidate its status as a negotiable instrument. *See* U.C.C. § 3–

105 ("A promise or order otherwise unconditional is not made conditional by the fact that the instrument .... states that it is secured, whether by mortgage, reservation of title or other wise ...."). In all other respects, the proffered mortgage notes meet the requirements of a negotiable instrument. They were signed, contain an unconditional promise to pay a sum certain in money, and contain no other promise, order, obligation or power. *See* N.Y. U.C.C. § 3–104(1).

The submission contains the notes for six of the thirty-two Plaintiffs in the Second Amended Complaint. The Second Amended Complaint alleges that the Lenders, in drafting these mortgage notes, "followed the underwriting requirements set forth by these Current Lenders, had open lines of credit from these Current Lenders and were not required to submit the loan applications for pre-approval to these Current lenders." Second Amended Complaint ¶ 109. This language suggests typicality and commonality amongst all of the mortgage notes. It is also notable that, after Chase Manhattan Mortgage Corp. submitted these representative mortgage notes, Plaintiffs' have not come forward to argue that these notes are not typical or representative of all of the notes at issue.[7] Therefore, based upon the submissions of the parties, the Court has no reason to doubt that these proffered negotiable instruments are representative of all of the mortgage notes.

■ Continuing through the analysis of holder in due course status, the Court considers whether the Current Lenders took the instruments for value, Plaintiffs allege that the "notes held by the Current Lender[s] ... are grossly over-inflated due to the practices described above." *Id.* ¶ 131. According to the Second Amended Complaint, the loans were inflated at the time they were formed and then purchased for value, either at closing or on the secondary market. *Id.* ¶¶ 114–116, 124–127, 130. There is no allegation that the mortgage notes themselves were acquired for less than their fair market value, based upon the value of the underlying promise to pay. Therefore, the Court concludes that, based upon the allegations of the Second Amended Complaint, the notes were purchased for value.

With regard to good faith, the question, under New York Law is not whether the Current Lenders "[sh]ould have known, or would have inquired concerning the alleged" malfeasance by the Sellers and Lenders, "but rather, the inquiry is what [the Current Lenders] ... actually knew." *Chemical Bank of Rochester v. Haskell,* 51 N.Y.2d 85, 92, 432 N.Y.S.2d 478, 411 N.E.2d 1339 (1980). "If [the Current Lenders] did not have actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments, then its good faith was sufficiently shown." In the Second Amended Complaint, there is no allegation that the Current Lenders had actual knowledge of any facts that would violate the above quoted standard.[8]

Finally, the Court must consider whether the Current lenders possessed notice that the mortgage notes were overdue, dishonored, or subject to any defense against or claim. Plaintiffs allege that,

---

**7.** If Plaintiffs' omission was motivated by inadvertence, rather than concession, Plaintiffs' may submit a motion for reconsideration on this discrete issue within 10 days of the date of this order. However, to the extent that the submitted mortgage notes are actually representative, in relevant part, of all of the mortgage notes, Plaintiffs are advised that any such motion will fail.

**8.** To the extent that Plaintiffs intended to incorporate the "good faith" prong into their "fair inference" argument, the argument is discussed in the discussion of "notice," *infra.*

with regard to those Current Lenders that arranged for assignment of mortgage notes prior to or at the closing on Plaintiffs' homes, a "fair inference" may be drawn that they had knowledge of the fraud and malfeasance attributed to the Sellers and Lenders. *See* Plaintiffs' Reply Brief 8–9. To support this proposition, Plaintiffs rely upon *Associates Home Equity Serv., Inc. v. Troup*, 343 N.J.Super. 254, 270, 778 A.2d 529 (2001). Assuming arguendo that *Troup* presents a valid statement of the law, the case does not aid the Court's analysis.

"Notice" under the holder in due course provision, N.Y. U.C.C. § 3–302(1), means "actual knowledge." *Chemical Bank*, 51 N.Y.2d at 92, 432 N.Y.S.2d 478, 411 N.E.2d 1339; *see also Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d Cir.1982) ("Under New York law notice of defenses means actual, subjective knowledge of defenses."). Plaintiffs have failed to plead actual knowledge in the Second Amended Complaint. Not once, in the memoranda regarding the instant motion, do Plaintiffs argue that they can allege actual knowledge. Instead, Plaintiffs rely upon the argument that the alleged circumstances can create an *inference* "that ... some of the Current Lenders participated in imposing the terms of at least some of the over-inflated loans." Plaintiffs' Reply Memorandum at 9. However, even giving this argument full persuasive credit, it still fails to articulate any allegation that the Current Lenders had *actual knowledge* of any claims or fraud. *Cf. D.H. Cattle Holdings Co. v. Kuntz*, 165 A.D.2d 568, 568 N.Y.S.2d 229, 230–231 (3d Dep't 1991) ("[I]t is clear that a holder is under no duty to investigate the status of a contract underlying a note even when there exists suspicious circumstances

which might induce a prudent banker to do so.").

2. **Necessary Parties Under Fed R. Civ. P. 19(a).**

Plaintiffs also argue that "the Current Lenders must be joined because, without their presence, complete relief cannot be afforded among those already parties." Plaintiffs' Reply Memorandum at 10. In support of this argument Plaintiffs rely heavily upon *State of New York v. Harris Home Design*, No. 88 CIV. 4086, 1989 WL 88690 (S.D.N.Y. Aug. 2, 1989) (Kram, J.). *Id.* The Court declined to adopt this rationale in its January 6, 2003, decision. In the context of the instant motion, Plaintiffs have advanced no persuasive reasons to alter this decision. As such, the Court incorporates that decision into this Order. However, for the purpose of clarity, the Court will synopsize its rationale here.

The Court declines to embrace Plaintiffs' argument that Rule 19(a) allows the joinder of a claim against a defendant whether or not it can state a valid claim. As ably stated in Defendant Fleet Mortgage Corporation's Memorandum: "There is simply nothing in Rule 19 itself—a joinder rule—to suggest that it can serve as a basis for relief against a party as to which no substantive claim has been asserted." Fleet Mortgage Corporation's Memorandum at 8. Moreover, to the extent that Judge Kram's decision in *Harris Home* suggests otherwise, the Court declines to adopt that decision's rationale.[9] In short, the Court concludes that Plaintiffs cannot, via Rule 19(a), join the Current Lenders where there is no underlying claim.

---

9. Apparently, the loans at issue in *Harris Home* could not be the basis for holder in due course status because they constituted retail installment contracts under N.Y. Pers. Prop. Law § 401. *See* Chase Manhattan Mortgage's Memorandum at 11. If true, this could be a basis to factually distinguish *Harris Home* from the instant circumstances.

III. CONCLUSIONS

For the foregoing reasons, Plaintiffs' motion for leave to amend the complaint is DENIED. With regard to the Lenders, this dismissal is without prejudice to file a renewed motion for leave to amend the complaint. *See Luce v. Edelstein,* 802 F.2d 49, 56 (2nd Cir.1986) ("Complaints dismissed under Rule 9(b) [for insufficient particularity] are 'almost always' dismissed with leave to amend.") (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 9.03 at 9–34 (2nd ed.1986)). The requirement for a pre-motion conference is WAIVED for the renewed motion for leave to amend the complaint. Any such renewed motion shall (1) be served and filed within thirty days of this Order (2) include a copy of the proposed Third Amended Complaint and (3) include a memorandum, not to exceed twenty pages, discussing how the concerns detailed in this order have been addressed.

Plaintiffs may not renew their motion with respect to the Current Lenders. As discussed in Section II.B. *supra,* Plaintiffs have not provided the Court with any indication that they could ever articulate a valid claim against the Current Lenders. As such, any further motions for leave to amend as to the Current Lenders would be futile. *See Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (district court is within its discretion to deny leave to amend where amendments would not serve any purpose); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("where ... there is no merit in the proposed amendments, leave to amend should be denied").

**SO ORDERED.**